# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

| | |
|---|---|
| PHYTELLIGENCE, INC., <br><br> Plaintiff, <br><br> v. <br><br> WASHINGTON STATE UNIVERSITY, <br><br> Defendant. | Case No. C18-405 RSM <br><br> ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

## I. INTRODUCTION

This matter comes before the Court on Defendant Washington State University's Motion for Summary Judgment. Dkt. #46. Plaintiff Phytelligence, Inc. opposes. Dkt. #64. The Court has determined it can rule on this Motion without oral argument.[1] For the reasons stated below, this Motion is GRANTED.

## II. BACKGROUND

Phytelligence is an agricultural biotechnology company. Dkt. #66 ("Leyerle Decl."), ¶¶ 2–3; Dkt. #1-1 ("Complaint"), ¶¶ 4–5. Phytelligence uses a trade secret propagation process to grow food crop plants that are fully-rooted, have genetically confirmed varieties, and are

---

[1] Oral argument has been requested by Plaintiff. However, "[w]hen a party has [had] an adequate opportunity to provide the trial court with evidence and a memorandum of law, there is no prejudice [in a refusal to grant oral argument]." *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998) (quoting *Lake at Las Vegas Investors Grp., Inc. v. Pac. Malibu Dev. Corp.*, 933 F.2d 724, 729 (9th Cir. 1991)). "In other words, a district court can decide the issue without oral argument if the parties can submit their papers to the court." *Id*. Here, the issues have been thoroughly briefed by the parties and oral argument would not be of assistance to the Court. *See also* LCR 7(b)(4) ("Unless otherwise ordered by the court, all motions will be decided by the court without oral argument.").

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 1

guaranteed virus and disease-free, for eventual sale to food crop growers. Leyerle Decl. at ¶ 3. Phytelligence sells itself as an innovator in the field and a potentially disruptive competitor of traditional nurseries. *Id*.

Defendant Washington State University ("WSU") owns the patent to an apple cultivar known as WA 38, which is sold under the trademark COSMIC CRISP. *See* Dkt. # 1-2 at 5.

By the late fall of 2012, WSU had developed WA 38 but had not made a firm decision whether to commercialize it. Leyerle Decl. at ¶ 5. WSU did not have the facilities to grow and maintain a sufficient number of WA 38 plants to distribute them to nurseries and others if commercialization were to occur. *Id*. WSU and WSURF therefore asked Phytelligence to propagate WA 38 plants for eventual sale and distribution. *Id*.

On November 28, 2012, Phytelligence and WSU's predecessor-in-interest Washington State University Research Foundation ("WSURF")[2] entered into a "Propagation Agreement" with respect to WA 38. *See* Dkt #1-1 at 10 ("Agreement to Propagate Apple Cultivar Plant Materials for Washington State University"). This contract forms the basis for this legal action. The Propagation Agreement allowed Phytelligence (the "Propagator") to propagate WA 38 plants, which was apparently of some research benefit to Phytelligence. The Propagation Agreement forbids Phytelligence from selling any WA 38 plants unless it receives "authorization to do so under a separate contract with WSURF, or an agent of WSURF, in accordance with Section 4 of the Agreement." *Id*. Unless and until Phytelligence receives such authorization to sell under a separate contract, any WA 38 plants that it propagates "remain the sole and absolute property of WSU and/or WSURF." *Id*. at 12.

---

[2] WSU has assumed all of WSURF's rights, obligations and liabilities under the Agreement. Dkt. #65-1 ("Pappu Dep.") at 27:15-29:5.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 2

Section 4 of the Propagation Agreement states, in full:

> 4. OPTION TO PARTICIPATE AS A PROVIDER AND/OR SELLER IN WSURF LICENSING PROGRAMS: If Propagator is an authorized provider in good standing under WSDA's Washington State Fruit Tree Certification Program in accordance with Section 5, below, by signing this Agreement, Propagator is hereby granted an option to participate as a provider and/or seller of Plant Materials listed in Exhibit A, if the Cultivar is officially released by WSU and becomes available for licensing by WSURF, or an agent of WSURF. Propagator will need to sign a separate contract with WSURF, or an agent of WSURF, to exercise this option. If any of the WSU Cultivars listed in Exhibit A are not released by WSU, Propagator agrees to destroy all Plant Materials of such Cultivars upon written notification by WSURF that it will not release a specific cultivar. It is anticipated that this Agreement will be amended from time-to-time to include additional Cultivars under Exhibit A.

*Id*. The parties agreed that Washington law applied to any subsequent interpretations of the Agreement. *Id*. at 13.

Prior to signing the Agreement, Chris Leyerle, Phytelligence's CEO, sent an email to Tom Kelly, a licensing associate at WSURF, asking several questions about the option in Section 4. Leyerle Decl. at ¶ 7; Dkt #66-3. The parties wrote back and forth. Mr. Leyerle also reached out to Anson Fatland, the Interim Executive Director of WSURF and Mr. Kelly's boss. *Id*. at ¶ 10; Dkt #66-7. Phytelligence argues in in briefing:

> Mr. Leyerle clearly communicated to both Mr. Kelly and Mr. Fatland that Phytelligence would not enter into an agreement to propagate WA 38 without assurance that it would be offered a license to sell and distribute WA 38 if and when WSU decided to commercialize it. Leyerle Decl., ¶ 11. Mr. Leyerle was told by Mr. Kelly, Mr. Fatland and others that there would be an internal process at WSU to decide whether and how to commercialize WA 38. *Id*. ¶ 12. If WSU decided to commercialize WA 38, the process would result in a set of standard terms and conditions pursuant to which industry participants could sell and distribute WA 38. *Id*. Both Mr. Kelly and Mr. Anson assured Mr. Leyerle that by entering into the Propagation Agreement, Phytelligence would have the option to acquire a non-exclusive license on those

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 3

> standard terms if and when a decision was made to commercialize WA 38. *Id*. Mr. Kelly's and Mr. Fatland's assurances were consistent with then-existing WSU and WSURF custom and practice with respect to licensing. By November 2012, their general practice in connection with the commercialization of any cultivar was to engage in processes and procedures culminating in uniform license terms. [Pappu Dep.] at 60:1-5, 69:9-19. By that time, among other things, WSURF had commercialized another apple variety, WA 2, pursuant to non-exclusive license agreements put in place uniformly. *Id*. at 55:16-56:08, 59:3-9. Section 4 of the Propagation Agreement, the option clause at issue, contains form language that had been previously used by WSURF six to eight times for various other crops, including WA 2. *Id*. at 37:8-38:1, 38:21-39:14, 73:17-22; Ex. 26 (Pappu 4). Thus, with the assurance that Phytelligence would have the right to obtain a license to commercialize WA 38 on standard terms available to other propagators, if and when one became available, Phytelligence entered into the Propagation Agreement. Leyerle Decl. ¶ 14. Upon doing so, Phytelligence immediately took steps to begin propagating WA 38. *Id*.

Dkt. #64 at 10–11.

On March 7, 2013, WSU sent an "Announcement of Opportunity" to Phytelligence and others, announcing WSU's official commercial release of WA 38 and seeking support to manage the commercialization effort. Leyerle Decl. at ¶ 17; Dkt #66-9.

Phytelligence's competitors, Proprietary Variety Management, LLC ("PVM") and Northwestern Nursery Improvement Institute ("NNII"), an association of fruit tree nurseries, submitted proposals to WSURF in response to the Announcement of Opportunity. It does not appear from the record that Phytelligence submitted a proposal at this time. By June 3, 2013, WSU's plans for commercializing WA 38 included signing up both NNII nurseries and other interested non-NNII nurseries, including Phytelligence, to propagate and sell trees and buds pursuant to written agreements, the template for which WSU would review and approve in advance. Dkt. #65-2 ("Moyer Dep.") at 69:02-69:22. As an association of traditional fruit tree

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 4

nurseries, Phytelligence sees NNII as "part of the industry Phytelligence's technology is threatening to disrupt." *See* Leyerle Decl., ¶ 3.

On June 27, 2014, WSU appointed PVM to be its agent for commercialization and granted PVM an "exclusive" license to propagate, grow and sell WA 38 plants in the United States. Dkt #47 at 2; Dkt #47-1. PVM in turn subcontracted with NNII to propagate WA 38 trees and sell them to apple growers. *Id.*

Several years passed, apparently without communication between the parties—neither party discusses events in 2015 or 2016. Phytelligence eventually communicated with WSU to exercise its option to participate as a provider and/or seller in WSU's licensing program for WA 38, including by sending formal written notice to WSU on May 18, 2017. Pappu Dep. at 76:23-77:14. WSU acknowledged the existence of the option and that Phytelligence was exercising or attempting to exercise it. *Id*.

After much communication between PVM, Phytelligence, and WSU, in which the role of Phytelligence's Section 4 option was in dispute, WSU essentially required Phytelligence to obtain membership with NNII if it wanted "commercialization rights similar to other propagators," in the words of Phytelligence. *See* Pappu Dep. at 122:14–128:25; Dkt #47-5 at 3; Dkt #64 at 15. This was consistent with WSU's requirement that all propagators wishing to sell WA 38 join NNII. Phytelligence contends this effectively eliminated its option under the Agreement. Dkt. #64 at 16. Phytelligence did not accept this arrangement.

On February 26, 2018, Phytelligence filed this lawsuit in state court with the following causes of action: breach of contract and declaratory judgment to determine its rights under the Propagation Agreement. Dkt. #1-1. WSU removed to this Court on March 19, 2018. Dkt. #1.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 5

## III. DISCUSSION

### A. Legal Standard for Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Material facts are those which might affect the outcome of the suit under governing law. *Anderson*, 477 U.S. at 248. In ruling on summary judgment, a court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994) (citing *Federal Deposit Ins. Corp. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992)).

On a motion for summary judgment, the court views the evidence and draws inferences in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Sullivan v. U.S. Dep't of the Navy*, 365 F.3d 827, 832 (9th Cir. 2004). The Court must draw all reasonable inferences in favor of the non-moving party. *See O'Melveny & Meyers*, 969 F.2d at 747, *rev'd on other grounds*, 512 U.S. 79 (1994). However, the nonmoving party must make a "sufficient showing on an essential element of her case with respect to which she has the burden of proof" to survive summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

### B. Extrinsic Evidence

Phytelligence's claims rely heavily on extrinsic evidence—communications between the parties before and after the contract at issue was signed, as well as WSU's common practices with similar contracts. The Court will first determine whether such extrinsic evidence should be considered in this case.

Washington follows the "objective manifestation theory" of contract interpretation. *See Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 115 P.3d 262, 267 (2005). In other words, Washington courts "[focus] on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties." *Id*. Washington courts thus "impute an intention corresponding to the reasonable meaning of the words used." *Id*. They "do not interpret what was intended to be written but what was written." *Id*.

This objective manifestation rule coexists with Washington's "context rule," which allows extrinsic evidence to help determine the meaning of specific words and terms used. *See Berg v. Hudesman*, 115 Wn.2d 657, 801 P.2d 222, 229 (1990). However, extrinsic evidence may not be used to "'show an intention independent of the [contract]' or to 'vary, contradict[,] or modify the written word.'" *Hearst*, 154 Wn.2d at 503 (quoting *Hollis v. Garwall, Inc.*, 137 Wn.2d 683, 695, 974 P.2d 836 (1999)). If a written contract is fully integrated, extrinsic evidence is not admissible under the parol evidence rule to add to the terms. *Hulbert v. Port of Everett*, 159 Wn. App. 389, 400, 245 P.3d 779 (2011).

Here, the Agreement at issue states that "by signing this Agreement, Propagator is hereby granted an option to participate as a provider and/or seller" if certain conditions are met, but that "Propagator will need to sign a separate contract with WSURF, or an agent of WSURF, to exercise this option." These words indicate that Phytelligence held an option after signing but could not exercise the option until a separate contract—terms not detailed—was signed in the future. The Agreement does not contain an integration clause.

In its response brief, Phytelligence argues that the Court must consider extrinsic evidence under the context rule to support its argument that WSU breached Section 4 by not honoring its option. *See* Dkt. #64 at 16–27. Phytelligence argues that the Agreement was only

partially integrated. *Id.* at 17. Phytelligence quotes *Berg, supra*, at length but does not cite or discuss *Hearst, supra*.

On Reply, WSU argues that "Phytelligence's response relies on a misunderstanding of the 'extrinsic evidence' rule in Washington, and boils down to this: because WSU generally commercializes cultivars according to 'standard' or 'uniform' license terms, when the parties signed the Propagation Agreement in 2012, they must have agreed that the 'separate contract' referred to in Section 4 would consist of 'standard' or 'uniform' license terms." Dkt. #71 at 8. WSU correctly identifies that Phytelligence "points to no words in Section 4 promising that WSU would enter any particular license agreement with Phytelligence, standard or otherwise." *Id.* WSU argues:

> Even if the Propagation Agreement is partially integrated (which WSU does not concede), Phytelligence still cannot rely on extrinsic evidence that is "inconsistent with the written terms." *Emrich v. Connell*, 105 Wn.2d 551, 556, 716 P.2d 863 (1986) (emphasis omitted). To be admissible, extrinsic evidence must both assist in determining the "meaning of specific words and terms used" in Section 4, and not contradict those words. *Hearst*, 154 Wn.2d at 503; *Emrich*, 105 Wn.2d at 556; *DePhillips v. Zolt Constr. Co.*, 136 Wn.2d 26, 32-33,959 P.2d 1104 (1998). The extrinsic evidence must also "prove the existence of agreed-upon terms." *Clear Channel Outdoor Inc. v. Port of Seattle*, 482 F. App'x 211, 214 (9th Cir. 2012). Where "there simply is no evidence of such terms," the Court may not use extrinsic evidence to supply the undefined terms. *Id.*

*Id.* at 10–11. WSU notes that Phytelligence only pleads breach of the Propagation Agreement, not additional oral side agreements, and that any attempt to argue breach of such oral side agreements would be procedurally improper at this point. Dkt. #71 at 10 n.3 (citing *Baden Sports, Inc. v. Molten*, 2007 WL 2056402, at *12 (W.D. Wash. July 16, 2007)).

The Court finds that Section 4 unambiguously requires a future contract without detailing the terms of such a contract. Under *Hearst* and subsequent cases, the Court cannot

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 8

consider extrinsic evidence that shows an intention independent of the Agreement or that varies, contradicts, or modifies the written word. Phytelligence attempts to show that the parties intended to agree that the future contract referred to in Section 4 would consist of 'standard' or 'uniform' license terms, but the extrinsic evidence is too vague to demonstrate the meaning or context of the word "contract." That the absence of such context could result in an unenforceable "agreement to agree," see Section C below, does not alone permit application of the context rule, or otherwise permit the consideration of extrinsic evidence. In any event, the extrinsic evidence does not appear to the Court to "prove the existence of agreed-upon terms." *See Clear Channel Outdoor Inc.*, *supra*. Given all of the above, the Court will not consider the extrinsic evidence supplied by Phytelligence for purposes of interpreting the contract.

## C. The Agreement to Agree

When the Court relies on inferences drawn from extrinsic evidence, contract interpretation is a question of fact. *Barron v. Am. Family Mut. Ins. Co.*, 2017 U.S. Dist. LEXIS 64120, *5–6, 2017 WL 1511033 (W.D. Wash. April 27, 2017) (citing *Viking Bank v. Firgrove Commons 3, LLC*, 183 Wn. App. 706, 712, 334 P.3d 116 (2014)). Absent disputed facts, the legal effect of a contract is a question of law. *Id*. at *6.

WSU argues this case relies on "an agreement to agree," unenforceable under Washington law. Dkt. #46 at 7–8. An agreement to agree is "an agreement to do something which requires a further meeting of the minds of the parties and without which it would not be complete." *Keystone Land & Dev. Co. v. Xerox Corp.*, 152 Wn.2d 171, 175, 94 P.3d 945 (2004) (quoting *Sandeman v. Sayres*, 50 Wn.2d 539, 541-42, 314 P.2d 428 (1957)). WSU relies on *Johnson v. Star Iron & Steel Co.*, 9 Wn. App. 202, 206, 511 P.2d 1370 (1973), which held that "[a]n agreement to negotiate a contract in the future is nothing more than negotiations" and that

a proposal can "ripen into a contract" only if it is "definite enough" so that when it is accepted "it can be determined, with at least a reasonable degree of certainty, what the nature and extent of the obligation is which the proposer has assumed." Dkt. #46 at 8. WSU cites to several Washington cases where the court refused to enforce an agreement to agree. *Id.* at 8–11 (citing *Setterlund v. Firestone*, 104 Wn.2d 24, 700 P.2d 745 (1985); *Hubbell v. Ward*, 40 Wn.2d 779, 246 P.2d 468 (1952); *Sandeman v. Sayres*, 50 Wn.2d 539, 314 P.2d 428 (1957); *Pacific Cascade Corp. v. Nimmer*, 25 Wn. App. 552, 608 P.2d 266 (1980); *YS Built, LLC v. Ya Hsing Chiang Huang*, 224 F. Supp. 3d 1149 (W.D. Wash. 2016), *aff'd*, 739 Fed. App'x 414 (9th Cir. 2018); *Keystone Land & Dev. Co. v. Xerox Corp.*, 152 Wn.2d 171, 94 P.3d 945 (2004); *FDIC v. Uribe, Inc.*, 171 Wn. App. 683, 287 P.3d 694 (2012); *16th Street Inv'rs, LLC v. Morrison*, 153 Wn. App. 44, 223 P.3d 513 (2009); *Johnson v. Star Iron & Steel Co.*, 9 Wn. App. 202, 511 P.2d 1370 (1973)).

In Response, Phytelligence relies heavily on the extrinsic evidence above. Phytelligence argues it is "entitled to participate in WA 38 commercialization on the same standard terms made available to other propagators." Dkt. #64 at 29.

Here, it is clear from the contract language at issue that the parties intended Phytelligence to have an option to participate, but the terms were insufficiently laid out in writing, and that the parties agreed at most that a future contract would lay them out. WSU's cited cases where the parties agreed to agree are analogous. That WSU cites to cases with rulings after bench trials rather than summary judgment is immaterial; here Phytelligence is still required to make a "sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof" to survive summary judgment. *Celotex, supra*. There are no genuine disputes of material fact. Phytelligence has not made a sufficient showing that

WSU breached this Agreement by failing to provide a contract to Phytelligence with standard terms, or without requiring membership in NNII; such was not in the Agreement. The Court agrees with WSU that "alleged oral assurances by Mr. Kelly and Dr. Fatland… amount to nothing more than statements of future intent," and were not contractually binding. Dkt. #71 at 13. Accordingly, Phytelligence's contract and declaratory judgment claims are properly dismissed.

## IV.    CONCLUSION

Having reviewed the relevant briefing, attached declarations, and the remainder of the record, the Court hereby finds and ORDERS that Defendant Washington State University's Motion for Summary Judgment (Dkt. #46) is GRANTED. All of Plaintiff Phytelligence's claims are DISMISSED. All pending Motions are terminated as moot. All currently sealed documents are to remain sealed. This case is CLOSED.

DATED this 14th day of June 2019.

RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE